

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ONE WORLD TECHNOLOGIES, LTD. and RYOBI TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 04 C 4337 |
| REXON INDUSTRIAL CORP., LTD., POWER TOOL SPECIALISTS, INC., PORTER-CABLE CORP., DELTA INTERNATIONAL MACHINERY CORP., and PENTAIR, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

One World Technologies, Ltd. and Ryobi Technologies, Inc. (collectively, "One World") have sued the defendants for infringement of two patents. One World asserts U.S. Patent No. 6,755,107 against Rexon Industrial Corp., Ltd. and Power Tool Specialists, Inc. (collectively, "Rexon") and Porter-Cable Corp., Delta International Machinery Corp., and Pentair, Inc. (collectively, "Porter-Cable"). One World also asserts U.S. Patent No. 6,360,797 against Rexon. This case is before the Court for construction of disputed claim language in the two patents-in-suit.

### Facts

One World contends that the Rexon and Porter-Cable defendants' miter saws infringe the '107 patent, entitled "Interrupted Laser Line Patent." Miter saws are used to cut at precise angles

1

workpieces made of wood and other materials. Prior to inventions that improved the ease of alignment, the operator of the saw would mark the location of the cut on the workpiece according to precise measurements and would typically lower the saw head assembly to the workpiece to determine if the blade was aligned with the reference mark. If necessary, the operator would raise the saw and move the workpiece until the proper alignment was achieved.

Inventors have proposed various solutions to improve the ease of aligning the blade to the desired area to be cut on the workpiece, including the use of lasers and louvered blade guards that the operator can see through while cutting. One World built upon the prior art by developing a laser beam alignment system designed to align the saw blade and the workpiece while at the same time protecting the operator from cutting the debris and from having the laser beam directed into his eyes.

One World asserts claims 4-19 against Rexon and claims 4-10 against Porter-Cable. The parties contest twelve claim limitations with respect to the '107 patent.

One World's "Portable Power Tool Assembly Patent," which is covered by number 6,360,797, is a portable power tool assembly for a woodworking implement and motor that may be used in a variety of working conditions and locations without requiring disassembly or modification. The assembly generally includes a base, a handle, wheels, and retractable legs. When the retractable legs are extended, the assembly may be used as a stand-alone unit. Alternatively, the legs may be retracted, allowing the base to be placed directly on a horizontal surface, such as a workbench. The invention is said to have improved upon the prior art assemblies, which normally included a housing containing a power tool mounted to a separate stand or work bench, by enabling the operator to conveniently transport larger power tools

2

without disassembling the unit.

One World asserts claims 1-13 against Rexon with respect to the '797 patent. These parties dispute six limitations that they contend are material to resolution of the case. In addition to the briefs submitted, the parties were afforded the opportunity to present oral argument on claim construction for both patents during an April 22, 2005 hearing.

## Discussion

Construing the claims of the patent-in-suit is the first step in any patent infringement case. *See Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004). The construction of the claims is a question of law to be determined by the Court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995). The Federal Circuit directs courts to begin the claim construction analysis by examining the claim language itself. *See Hockerson-Halberstadt, Inc. v. Avia Group Intern, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000). Initially, the claim term's ordinary and customary meaning, as understood by persons skilled in the relevant technology, serves as the default meaning. *See id.* The court may use dictionaries, encyclopedias, and treatises to assist in determinating the ordinary and customary meaning of claim terms. *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002).

The presumption of ordinary meaning may be rebutted if the patentee acted as her own lexicographer by clearly setting forth an explicit definition of the term different from its ordinary meaning or if the patentee has disavowed the scope of claim coverage by using words of manifest exclusion or restriction. *Id.* at 1204. Thus, it is necessary to review the specification and, if submitted into evidence, the prosecution history to determine whether the inventor has used any

3

terms in a manner inconsistent with their ordinary meaning. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Courts may resort to extrinsic evidence only if the analysis of intrinsic evidence proves insufficient to resolve ambiguity in a disputed claim. *Hockerson-Halberstadt, Inc.*, 222 F.3d at 955.

### 1.    The '107 Patent

The first two disputed limitations, "narrow beam of light" and "adjacent the cutting disc" are found in nearly identical passages of claims four and five of the '107 patent. Claim four discloses "[a] cutting machine comprising: . . . a light source mounted to the motor driven cutting assembly and arranged to emit *a narrow beam of light adjacent the cutting disc* for providing a visual indication of the alignment of the cutting disc with the workpiece." A similar passage in claim five discloses "a miter saw comprising . . . . a light source mounted to the motor driven cutting assembly, the light source emitting a *narrow beam of light adjacent the circular saw blade* for providing a visual indication of the alignment of the circular saw blade with the workpiece."

### a.    Narrow beam of light

One World asserts that the phrase to "emit a narrow beam of light" means to give off a thin ray of light. Porter-Cable's proffered definition is a ray of light that appears narrow regardless of the vantage point from which it is viewed and does not cover a fan-shaped projection of light. In submitting this interpretation, Porter-Cable urges the Court to define the term so as to explicitly exclude a fan-shaped projection of light, which is the type of laser beam emitted by the Porter-Cable defendants' inventions.

The ordinary meaning of "narrow" is "of slender width," Merriam-Webster's Collegiate

4

Dictionary 772 (10th ed. 1999), or "of small or limited width, especially in comparison with length." The American Heritage Dictionary 1169 (4th ed. 2000). Merriam-Webster defines "beam" as "a ray or shaft of light." Merriam-Webster's Collegiate Dictionary 99 (10th ed. 1999). Thus, the ordinary meaning of narrow beam of light is a ray or shaft of light of slender width.

Porter-Cable does not appear to disagree that this is the ordinary meaning of the claim language. *See* Porter-Cable Resp. at 11. It urges the Court, however, to additionally specify that a fan-shaped projection of light does not fall within the bounds of this definition of "narrow beam." Porter-Cable refers the Court to the discussion of the Kelly Patent that appears in the background section of the patent and in the prosecution history. Porter-Cable argues that the Kelly Patent makes it clear that one of ordinary skill in the relevant technology would not include a fan-shaped beam within the definition of narrow beam. In essence, Porter-Cable urges the Court to undertake an infringement analysis, as all of Porter-Cable's products use light projectors that project light in a fan shape. It is settled law, however, that claims must not be construed with reference to an accused product. *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985). "It is only after the claims have been construed without reference to the accused device that the claims, as so construed, are applied to the accused device to determine infringement." *Id.* Thus, Porter-Cable's request that the Court find that "narrow beam" does not encompass a fan-shaped projection of light is premature.

Porter-Cable also submits the testimony of its expert, Paul Hatch, as evidence that one of ordinary skill in the technology would construe a claim limitation containing the term "narrow beam" to mean narrow from any vantage point and that this limitation excludes a fan-shaped

5

beam. Though the Court was willing to entertain Hatch's testimony during the claim

construction hearing to educate itself about the underlying technology, we will not rely on his

expert testimony in construing the claim. As mentioned above, courts should rely on extrinsic

evidence only if the meaning of a claim is ambiguous from the intrinsic evidence. *See*

*Hockerson-Halberstadt, Inc.*, 222 F.3d at 955. The parties have not suggested that the meaning

is ambiguous, nor does the Court find the language ambiguous. Nothing in the claim language,

specification, or prosecution history suggests that the phrase narrow beam of light means

something different from its ordinary and customary meaning. Moreover, the proposed expert

testimony specifically relates to whether or not a fan-shaped beam falls within the scope of the

claim limitation. The Court reiterates that it is premature to make that determination at the claim

construction juncture. In sum, the Court construes "narrow beam of light" to mean a ray or shaft

of light of slender width.

### b.    Adjacent the cutting disc

The parties next dispute the meaning of "adjacent the cutting disc" and "adjacent the

circular saw blade" limitations found in claims four and five. One World maintains that the

claim language unambiguously refers to the spatial relationship between the cutting disc or saw

blade and the end point of the light beam. Porter-Cable contends that the phrase should be

interpreted as requiring that the emission of the narrow beam of light originate at a location

adjacent to the cutting disc or saw blade. Porter-Cable asserts that the plain and ordinary

meaning of these limitations is ambiguous, as it is susceptible to both its own and One World's

interpretations. It urges the Court to adopt the narrower meaning, which Porter-Cable avers is its

own. Porter-Cable also maintains that its construction is in accord with the patent examiner's

6

understanding as evidenced in the prosecution history.

The Court agrees with One World that the claim language unambiguously refers to the spatial relationship between the end point of the laser beam and the cutting disc/saw blade. As One World points out in its reply, the surrounding claim language makes it clear that the light source mounted to the cutting assembly is arranged such that the narrow beam of light is emitted adjacent the cutting disc/saw blade. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) (instructing that the surrounding words of a term at issue in a claim construction debate must be considered in determining the ordinary meaning). Nothing in the claim language indicates that the light source itself is adjacent the cutting disc. In fact, the variation of the limitation found in claim five leaves even less doubt that this is the intended meaning, as the first part of the sentence describing the location of the light source, "a light source mounted to the motor driven cutting assembly," is separated by a comma from the next part of the sentence describing the light beam it emits, "the light source emitting a narrow beam of light adjacent the circular saw blade." Finally, the Court does not find compelling Porter-Cable's argument that the prosecution history indicates a contrary meaning for this limitation. The Court sees nothing in the file history that reflects that One World did anything to alter or disavow the ordinary meaning of the claim term in context as we have read it.

Having determined that the claim limitation refers to the spatial relationship between the end point of the light beam and the cutting disc or saw blade, the Court must determine the ordinary meaning of the terms. Porter-Cable does not appear to contest One World's definitions of these terms, as it provides no alternative definitions of its own. One World submits that the ordinary meaning of "adjacent" is "not distant: nearby" and the ordinary meaning of "emit" is "to

7

throw or give off or out." Merriam-Webster's Collegiate Dictionary 14, 378 (10th ed. 1999). In its entirety then, the proper construction of the limitation at issue in claim four is a light source arranged to give off a ray or shaft of light of slender width near the cutting disc. Similarly, the Court construes the limitation in claim five as requiring a light source giving off a ray or shaft of light of slender width near the circular saw blade.

### c. Interrupted pattern of light

Claims four, five, six, eleven, and twelve use the language "interrupted pattern of light" to describe the marking formed by the laser beam on the workpiece when the lower guard is in the closed position. One World construes these limitations as requiring a repetitively segmented projection of light. Rexon's proffered construction is a discontinuous line of light.

One World and Rexon submit similar definitions for "interrupt." One World cites Webster's definition, which defines the term as "to break the uniformity or continuity of." Merriam-Webster's Collegiate Dictionary 612 (10th ed. 1999). One World, however, does not explain how it derives "repetitively segmented" from this definition. Instead of focusing on the term's ordinary meaning, it cites for support language in other claims and the prosecution history that describe a series of spaced segments in the lower guard. Rexon's interpretation of the term as requiring a discontinuous line is truer to the ordinary meaning of "interrupted pattern of light." Moreover, nothing in the specification or prosecution history indicates that the inventor intended to use this term in a manner inconsistent with its ordinary meaning. As such, the Court adopts Rexon's construction of the limitation with respect to claims four, five, six, eleven, and twelve.

### d. Proximate the region of the cut

One World and Rexon contest the meaning of "proximate" as used in claims four, five,

8

and six.  The pertinent section of claim four discloses:

> [W]herein the lower guard is provided with a series of spaced apart segments formed in a portion of the guard interposed between the light source and the workpiece to be cut such that when the lower guard is in the closed position, the segments allow light to pass there through to form an interrupted pattern of light on the workpiece *proximate the region of the cut.*

Claims five and six contain language sufficiently similar to claim four that the following analysis applies equally to each.

According to One World, "proximate the region of the cut" means at or very near the area of the cut.  Rexon disagrees that the ordinary and customary meaning of "proximate" includes "at the area of the cut," and instead construes the claim language to mean next to or very near, but not in the region of the cut.  Rexon additionally contends that "region of the cut," as used in claims four and five, is unamenable to construction and is therefore indefinite, rendering the claims invalid pursuant to 35 U.S.C. § 112(2).

The Court concurs with Rexon's interpretation of the term "proximate."  One World has failed to provide a single dictionary definition of proximate that supports its contention that the ordinary meaning of proximate includes the exact point of reference.  Merriam-Webster defines proximate as "very near: immediately adjoining: CLOSE" and "nearly accurate or correct." Webster's Third New International Dictionary of the English Language 1828 (unabr. ed. 1993). Thus, the ordinary meaning of proximate does not include the point of reference.  Proximate should therefore be given its ordinary meaning, unless the specification or prosecution history indicates that the inventor intended otherwise.  The specification explains that to align the workpiece, the laser beam should be "projected as close as possible to the point at which the saw blade 12 will cut the workpiece 18 so that markings corresponding to the desired location of cut

9

on the workpiece 18 can be closely aligned with the laser beam 48." U.S. Patent No. 6,755,107, col. 5, lines 28-31. This excerpt from the specification supports the idea that the laser will be projected "close" to the location of the cut. In short, One World's interpretation of "proximate" is not supported by the intrinsic evidence.

The inquiry does not end there, however, because Rexon contends that regardless of how one defines proximate, the limitation is unamenable to construction because one of ordinary skill would not be able to determine the scope of the phrase "region of the cut." Pursuant to 35 U.S.C. § 112 ¶ 2, a patent applicant is required to conclude the specification by "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The Federal Circuit has construed this requirement to mean that a claim is indefinite if the language, when read in light of the specification, does not reasonably apprise one skilled in the relevant field of the scope of the invention. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003). But this standard is a fairly difficult one to meet. A claim is not indefinite simply because its scope is unascertainable from the claim language itself. Rather, a claim is indefinite only if it is "insolubly ambiguous, and no narrowing construction can properly be adopted." *Id.* (quoting *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)).

Though the phrase "region of the cut" is a less than stellar example of claim drafting, it is not so vague that one in the field would be unable to determine the scope of the claim, nor is it ambiguous to the point that a fact finder would be unable to logically determine whether an accused product infringes the patent. "Region" is defined as "an area or division." The New Oxford American Dictionary 1434 (2001). Thus, the ordinary meaning of the contested

limitation requires that the segments allow light to pass through to form an interrupted pattern of light on the workpiece close to or very near the area of the cut. The entire purpose of the invention as described in the specification, as well as the figures illustrating a device that aligns the laser beam very close to the point at which the saw pierces the workpiece, support this interpretation.

### e. During the cutting of the workpiece

The limitation at issue in claim six discloses

> A series of spaced apart segments formed in a portion of the outer peripheral edge of the shield interposed between the light source and the work piece to be cut when the shield is in the closed position to allow light to pass there through and to form an interrupted pattern of light on the workpiece proximate the region of the cut, *the pattern of light on the workpiece becoming solid as the shield moves to the uncovered position during the cutting of the work piece.*

The basic dispute surrounding this limitation concerns whether "cutting" refers to the entire process of cutting or whether it is strictly limited to the blade piercing the workpiece. One World asserts that the claim should be construed to require that the pattern of light changes to uninterrupted as the shield moves to the uncovered position while the cutting head assembly is lowered toward the workpiece as the saw blade is rotating. More specifically, during the claim construction hearing, One World contended that "cutting" includes the process of turning on the power and lowering the cutting head assembly toward the workpiece. It emphasizes that defendants' interpretation of the claim limitation would exclude the invention because the blade cannot pierce the workpiece until the guard has completely moved to the uncovered position, thus supporting One World's construction that the line must become solid at some point before the blade actually penetrates the workpiece.

11

Both Rexon and Porter-Cable contend that the proper construction requires that the pattern of light become solid while the saw blade is actually penetrating the workpiece, not before.[1] They argue that the ordinary meaning of the language compels this reading and that because the language is unambiguous on its face, the Court would essentially be redrafting the claim were it to accept One World's interpretation. As will be detailed below, the defendants also assert that the specification supports their interpretation of the word "cutting."

The appropriate resolution of this limitation is a close call, as the Court is confronted with choosing between canons of construction that are somewhat contradictory when applied to this claim limitation. On the one hand, the Federal Circuit directs courts to give claim terms their ordinary meaning absent an express intent by the inventor to impart a different meaning to the terms. *See Elekta Instrument S.A. v. O.U.R. Scientific Intern, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000). The ordinary meaning of "cut" is "to penetrate with or as if with an edged instrument," and the ordinary meaning of "during" is "at a point in the course of." Merriam-Webster's Collegiate Dictionary 286, 360 (10th ed. 1999). These definitions seem to support the defendants' reading of the claim.

However, though there is a heavy presumption that language in a claim carries its ordinary meaning, a claim must also be considered in the context of the intrinsic evidence, namely, the claims, specification, and prosecution history. *Housey Pharmaceuticals, Inc. v. Astrazeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004). The Federal Circuit has stated that

---

[1] More precisely, Rexon submits that the pattern of light transforms from an interrupted, discontinuous pattern to a solid, continuous pattern as a result of the shield moving from the covered position to the uncovered position, both of which occur at a point during the course of the blade cutting, or directly acting upon, the workpiece. Similarly, Porter-Cable construes the claim as requiring that the pattern of light transition from interrupted to solid during a period of time when the saw blade is penetrating the workpiece.

the specification "is the single best guide to the meaning of a disputed term." *Vitronics Corp.*, 90 F.3d at 1582.

In this case, defendants' proposed construction would exclude the preferred embodiment disclosed in the specification and is directly at odds with language in the specification that clearly states that the solid line is first formed prior to penetration of the workpiece. For instance, in describing figure five, the specification states that the figure shows "a solid laser line projected on a workpiece *just prior to cutting*." U.S. Patent No. 6,755,107, col. 3, lines 11-12 (emphasis added). The specification likewise states that the solid line formed by the laser beam "indicates the position of the cut *just prior to and during the cutting operation*, as shown in Figure 5." *Id.*, col. 4, lines 28-30 (emphasis added). And the Summary of the Invention describes a solid line forming on the workpiece "*just prior to and while* the blade engages the workpiece." *Id.*, col. 2, lines 28-30 (emphasis added). Significantly, the language in other claims also supports the idea that the line first becomes solid prior to the blade penetrating the workpiece. Claims four and five both disclose "the pattern of light on the workpiece becoming solid as the lower guard moves to the open position when the motor driven cutting assembly *is moved to the cut position*."

Rexon asserts that the inventor must have intentionally drafted claim six to include language different from the above cited excerpts in an effort to limit the scope of claim six. Citing *Chef America, Inc. v. Lamb-Weston, Inc.*, Porter-Cable stresses that even if this construction was unintended or renders the claim invalid, the Court must construe the claims as written and may not redraft the claim to conform with how the patentee now wishes he would have written the claim. 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("Even 'a nonsensical result does not require the court to redraft the claims of the ['290] patent. Rather, where as here, claims are

susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated.'" (quoting *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 2002))).

In addition, Porter-Cable argues that the above excerpts from the specification and other claims actually support its interpretation, as language suggesting that the line turns solid "prior to and during the cutting operation" and "just prior to cutting" illustrate that One World did not consistently use the word "cutting" to refer to the period of time during which the cutting assembly is lowered toward the workpiece, but instead used it to refer to the blade penetrating the workpiece.

Each side presents a persuasive argument in favor of its respective interpretation. In resolving the dispute, the Court is particularly mindful of the Federal Circuit's charge that a claim construction that would exclude the preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp.*, 90 F.3d at 1583. Though evidentiary support is not wholly lacking, the Court does not find this case to be one of the rare exceptions to this general canon of construction. Unlike the limitations at issue in *Elekta Instrument S.A. v. O.U.R. Scientific Intern, Inc.*, 214 F.3d 1302 (Fed. Cir. 2000), and *Chef America*, two of the instances in which the Federal Circuit concluded that the defendants' construction was proper despite the fact that this construction would exclude the preferred embodiment disclosed in the specification, the limitation in the present case is susceptible to more than one reasonable interpretation.[2]

---

[2] In *Chef America*, the issue concerned the meaning of the claim language "heating the resulting batter-coated dough to a temperature in the range of about 400° F. to 850° F." The court concluded that the dough itself must be heated to that temperature range rather than finding that the limitation referred to the temperature of the

14

Moreover, there is evidence in the specification that One World intended "cutting" to encompass the process of lowering the cutting assembly toward the workpiece. The specification directs that "[w]hen an operator is ready to make a cut with the miter saw 10, the operator grips the handle 32 and pulls it down toward the workpiece 18 as he depresses the power switch." U.S. Patent No. 6,755,107, col. 3, lines 47-49. Though even this language is not entirely conclusive, it does tend to show that One World intended the term "cutting" to include the process of lowering the cutting assembly. There is unquestionably mixed evidence in the specification concerning the meaning of "cutting." But because the meaning of the claim is subject to more than one reasonable interpretation, the Court will construe the claim so as not to exclude the preferred embodiment. The Court thus accepts One World's proposed construction that the line becomes solid as the shield moves to the uncovered position while the cutting head assembly is lowered toward the workpiece.

### f.    Transparent material and transparent portion

One World and Porter-Cable dispute the meaning of "transparent material" as used in claim nine, which discloses "[t]he blade guard of claim 6 wherein the movable shield is formed of a *transparent material*." Similarly, One World and Rexon dispute the meaning of "transparent portion" as used in claims eleven and twelve, both of which disclose:

> A saw comprising . . . . a movable guard . . . having an opaque portion that blocks the beam of light to prevent the beam of light from being directed toward an

---

oven. 358 F.3d at 1374. Though this construction would mean the dough would be burned to a crisp, the court construed the claim in accordance with the "clear and unquestionable" ordinary meaning and noted that there was no indication that "their use in this particular conjunction changes their meaning." *Id.* at 1373. The court stressed that it is settled practice to interpret a claim as written rather than as the inventor wished he had written it. *Id.* at 1374. Similarly, in *Elekta Instrument S.A.*, the court held that the claim at issue was susceptible to only one reasonable construction, thus "the unambiguous language of the amended claim controls over any contradictory language in the written description." 214 F.3d at 1308.

operator of the saw and a *transparent portion* that allows the narrow beam of light to pass through to create a line of light on the workpiece when the moveable guard is disposed between the laser and the workpiece.

Because the parties have not suggested that the meaning of "transparent" differs from claim to claim, we will discuss these limitations together and adopt a uniform construction for the term.

One World submits that "transparent material," as used in claim nine, depicts a material that is "capable of transmitting light so that objects or images can be seen as if there were no intervening material." The American Heritage Dictionary 1834 (4th ed. 2000). Consistent with this definition, One World construes the limitations in claims eleven and twelve as requiring a portion of the guard to be capable of transmitting a line of light on the workpiece so that the line can be seen as if there were no intervening material when the movable guard is disposed between the laser and the workpiece.

Porter-Cable appears to agree that One World's interpretation reflects the ordinary meaning of transparent, as it cites an identical definition. Nor does Porter-Cable argue that this interpretation is inconsistent with the specification or prosecution history. Porter-Cable Resp. at 14. Instead, it requests that the Court construe "transparent material" so as to explicitly exclude tinted plastic. Again, Porter-Cable essentially asks the Court to make an infringement determination at the claim construction stage. Because we must refrain from construing the claims with reference to the accused devise, *see SRI Int'l*, 775 F.2d at 1118, the Court will not insert this extraneous language into the limitation.

Alternatively, Rexon submits a technical dictionary's definition of "transparent." The Photonics Dictionary defines "transparent" as material "capable of transmitting light with little absorption and no appreciable scattering or diffusion." The Photonics Dictionary D-143 (46th

16

ed. 2000). Though the ordinary dictionary's definition is consistent with the technical version, the Court accepts the more detailed, specialistic definition as the ordinary meaning of "transparent." *See Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1580 (Fed. Cir. 1996) ("[A] general dictionary definition is secondary to the specific meaning of a technical term as it is used and understood in a particular technical field."). The technical definition appears to expand on the ordinary dictionary's definition in a manner that those skilled in the field of photonics[3] would understand to be the relevant meaning of transparent within the context of light beams. Nothing in the specification or prosecution history indicates that One World intended to use the term "transparent" in a manner inconsistent with its ordinary meaning.

According to Rexon, the technical definition suggests that the limitations at issue in claims eleven and twelve should be construed to require there to be a portion of the guard that does not block rays of light and permits rays of light to be transmitted through the guard without loss of intensity. But Rexon has provided the Court with no supporting material to justify translating "little absorption" and "no appreciable scattering or diffusion" into "without loss of intensity." Thus, the Court will not alter the ordinary meaning as provided by the technical dictionary.

In sum, the proper construction of the disputed limitation in claim nine involves a movable shield formed of material that is capable of transmitting light with little absorption and no appreciable scattering or diffusion. Likewise, the limitation at issue in claims ten and eleven

---

[3] Photonics is defined as "[t]he technology of generating and harnessing light and other forms of radiant energy whose quantum unit is the photon. The science includes light emission, transmission, deflection, amplification and detection by optical components and instruments, lasers and other light sources, fiber optics, electro-optical instrumentation, related hardware and electronics, and sophisticated systems." The Photonics Dictionary, *available at* http://www.photonics.com/dictionary. No argument has been made that it is improper to consider this dictionary.

is construed as requiring a guard that has a portion that is capable of transmitting light with little or no absorption and no appreciable scattering or diffusion.

### g.    A lower portion

Claim ten discloses "[t]he blade guard of claim 6 wherein the series of spaced apart segments are formed in *a lower portion* of the peripheral edge of the movable shield with the remainder of the periphery edge being without segments." One World asserts that the ordinary meaning of "a lower portion" is a bottom part. Rexon contends that "lower portion" is unamenable to construction and is therefore indefinite. Rexon stresses that "lower," by definition, is a relative term, but it points out that the patent does not provide any guidance as to the site of the dividing line between the "lower portion" and the "upper portion." Thus, according to Rexon, the '107 patent does not apprise the public of where the spaced apart segments are and are not situated on the movable shield.

"Lower" is defined as "situated . . . below the level of another part" or "relatively low in position." Webster's Third New International Dictionary of the English Language 1341 (unabr. ed. 1993). And "part" is a synonym for "portion." *Id.* at 1768. Though the precise location of the segments is not entirely clear from the ordinary meaning of these terms, the wording is not insolubly ambiguous, particularly when viewed in light of the depiction of the movable shield shown in figures four and six. As discussed above, a claim is not indefinite merely because its scope is difficult to ascertain from the claim language itself. *See Amgen Inc.*, 314 F.3d at 1342. The figures make it clear that "lower" refers to the bottom half or section of the shield. This is consistent with One World's interpretation that the phrase "lower portion" means the bottom part of the shield. This definition is sufficiently definite for a fact finder to evaluate whether the

18

placement of segments on an accused product infringes the patent.

Rexon additionally appears to argue that claim ten is indefinite because it does not have a scope different from claim six, upon which claim ten depends. Claim six discloses a shield "provided with a series of spaced apart segments formed in a portion of the outer peripheral edge of the shield interposed between the light source and the workpiece to be cut when the shield is in the closed position to allow light to pass there through and to form an interrupted pattern of light on the work piece proximate the region of the cut." As One World notes, however, claim six does not define where on the shield the segments do and do not appear, and thus claim ten is narrower in scope and is not rendered invalid by claim six.

In sum, the Court adopts One World's proffered construction of "lower portion," which requires a series of spaced segments formed in the bottom part of the peripheral edge of the shield.

### h.     Opaque portion

Claims eleven and twelve disclose

> A saw comprising . . . . a movable guard . . . having an *opaque portion* that blocks the beam of light to prevent the beam of light from being directed toward an operator of the saw and a transparent portion that allows the narrow beam of light to pass through to create a line of light on the workpiece when the moveable guard is disposed between the laser and the workpiece.

One World and Rexon dispute the meaning of opaque within the claim.

One World's interpretation requires there to be a portion of the guard that prevents the beam of light from being directed towards the operator of the saw. In its opening brief, One World seems to argue both that this interpretation is consistent with the ordinary meaning of the limitation and that it is required because One World was acting as its own lexicographer and

19

expressly defined opaque within the limitation. One World's Opening Claim Construction Brief at 7-8. These positions are inconsistent. When a patentee acts as his own lexicographer, he uses the terms in a manner other than their ordinary meaning. *See Dow Chemical Co. v. Sumitomo Chemical Co.*, 257 F.3d 1364, 1373 (Fed. Cir. 2001). As best as the Court can determine, however, the patentee was not attempting to give opaque an unconventional meaning, but was instead providing the rationale behind having an opaque portion (i.e., to prevent the beam of light from being directed toward the operator's eyes). As Rexon asserts, there is no indication in claims eleven or twelve that One World intended to depart from the ordinary meaning of opaque.

One World defines opaque as "blocking the passage of radiant energy and esp. light." Merriam-Webster's Collegiate Dictionary 813 (10th ed. 1999). Rexon submits a technical dictionary's definition of the term, which defines opaque material as being "impervious to light," but urges the Court to adopt the following construction: the guard has a portion that blocks rays of light, and therefore is neither transparent nor translucent. The Photonics Dictionary D-97 (46th ed. 2000). Based on the definitions submitted by both parties, the Court finds the ordinary meaning of "opaque material" to be a substance that is impervious to light and therefore blocks the passage of light.

The Court rejects Rexon's attempt to insert into the limitation the additional language "neither translucent nor transparent." Rexon has not provided the Court with support for this rewording. At the risk of sounding like a broken record, the Court again notes that courts may not construe claims with reference to the accused product. Thus, the Court construes the limitation in accordance with its ordinary meaning: a substance that is impervious to light and therefore blocks the passage of light. Nothing in the specification or prosecution history

20

indicates a desire by the inventor to use the term in a manner inconsistent with the ordinary meaning.

### i.   To form a continuous line of light on the workpiece when the guard is in the open position while the blade engages the workpiece

Claim thirteen discloses "[t]he saw of claim 12 wherein the light source is arranged to project the narrow beam of light beyond one end of the moveable guard *to form a continuous line of light on the workpiece when the guard is in the open position while the blade engages the workpiece*." One World interprets this limitation to mean that a continuous line of light is formed on the workpiece when the guard is in the open position while the blade contacts the workpiece. Rexon asserts that the proper construction requires that a continuous line of light is created at the same time as when the blade engages, or contacts, the workpiece.

It is unclear to the Court exactly what the parties are disputing with respect to this claim. The parties seem to agree that "engages" means contacts. Each also defines "while" as meaning during the same time. The Court is in agreement that these definitions supply the ordinary meaning of these words. Rexon's proposed construction excludes any language referring to the guard being in an open position, but does not explain its decision to ignore the express claim language. Though it is questionable whether the parties' constructions actually pose a conflict, the Court interprets the limitation to mean that a continuous line is formed on the workpiece when the guard is in the open position during the same time the blade contacts the workpiece. This construction is not undermined by the specification or prosecution history.

### j.   A gap in the mask

One World and Rexon dispute whether the term "a gap" in claim fourteen refers to a

single gap, as Rexon argues, or whether it refers to a plurality of gaps, as One World asserts. Claim fourteen discloses "[t]he saw of claim 12, wherein the guard is formed from a transparent plastic material and wherein the opaque portion is formed by a mask and wherein the transparent portion is formed as *a gap* in the mask." The pertinent limitation of claim twelve, upon which claim fourteen depends, discloses a

> guard having an opaque portion that blocks the beam of light . . . and a transparent portion that allows the narrow beam of light to pass through . . . . wherein the transparent portion comprises *a plurality of gaps* in the opaque portion to project the emitted light beam on the workpiece as an interrupted pattern of light when the guard is in the closed position.

Rexon suggests that claim fourteen narrows the scope of the claimed invention such that a single non-opaque area is used to define the transparent portion. Focusing first on the claim language itself, the article "a" in the limitation does suggest a singular gap. However, courts construing claims have consistently held that the article "a" can carry the meaning "one or more" depending on the context in which it is used. *See Abox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999). For example, the article "a" can connote "one or more" when paired with the transitional phrase "comprising." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Claim twelve, in fact, discloses that "the transparent portion *comprises* a plurality of gaps," lending support to One World's contention that the wording of the dependent claim fourteen is not limited to a single gap.

Moreover, there are indications within other claims and the specification that the inventor intended "a gap" to connote something other than its normal singular meaning. The specification instructs that the "transparent area may be one or more transparent areas in the opaque portion of

22

the guard, or the guard may be formed of a transparent material having one or more portions thereof that are covered with a mask." U.S. Patent 6,755,107, col. 2, lines 18-21. When describing figures six and seven, the detailed description portrays the shield as having "a series of slits 56 or openings," *id.*, col. 4, lines 31-32, though it later states that "[i]nstead of a series of slits 56, a single transparent area can be formed." *Id.*, col. 4, lines 54-57. Claim four likewise discloses a lower guard with "a series of spaced apart segments," as do claims five and six. Similarly, claim eight discloses a blade guard with a "series of spaced apart segments" that "are transparent areas." Clearly, when viewing claim fourteen in the fuller context, One World intended that "a gap" refer to one or more gaps in the guard.

Rexon argues that construing claim fourteen as limited to a single transparent gap is consistent with the embodiment mentioned above, which states, "[i]nstead of a series of slits 56, a single transparent area can be formed in the shield so that a solid line is formed on the workpiece when the shield is in the position of Fig. 1." *Id.*, col. 4, lines 54-57. This alternative embodiment, however, describes a situation in which a laser beam forms a solid line on the workpiece, which is caused by a single transparent area as opposed to a series of transparent areas. The saw disclosed in claim twelve clearly contemplates a guard that projects an interrupted pattern of light, not a solid line of light, which implies that the guard has a plurality of gaps. As claim fourteen is a dependant claim, it includes all the limitations of the claim from which it depends, claim twelve. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). Moreover, the language describing the alternative embodiment is not inconsistent with the idea that the transparent area can be formed of one or more gaps. Thus, the alternative embodiment referred to by Rexon does not compel Rexon's reading of the limitation.

23

Because the Court has determined that "a," as used in claim fourteen, does not limit claim twelve to a single transparent gap, we accept One World's construction of the limitation, which requires that the opaque portion is formed by a protective covering and the transparent portion is formed as an interruption in the protective covering. This construction accords with the ordinary meaning of "gap" and encompasses both a guard that has one gap and a guard that has a plurality of gaps.

### k.    A base that has a pivoting portion that pivots

Claim sixteen discloses "[t]he saw of claim 12 wherein the saw is a miter saw having *a base that has a pivoting portion that pivots* relative to the fence and may be locked in a selected angular orientation for making a miter cut in a workpiece."

Rexon asserts that because the article "a" introduces the word "base," claim sixteen introduces "a base" as a new limitation, meaning that the invention requires both "a saw base" as disclosed in claim twelve, upon which claim sixteen depends, and "a base that has a pivoting portion." Rexon seems to argue that the claims disclose a miter saw with two separate bases. This construction is not supported by the ordinary language of claim sixteen, nor does it make sense within the context of the specification.

Though Rexon is correct that "a" oftentimes signifies the introduction of a new limitation, it would lead to absurd results to say that this is always the case. Were the claim language to disclose "a miter saw having *the* base that has a pivoting portion," the claim would sound grammatically impaired. Thus, in context, "a" does not serve to introduce a new element. There is no indication anywhere in the specification or prosecution history that the inventor intended the saw to have two bases. The Court adopts One World's construction of claim

24

sixteen, which requires a saw support[4] that pivots, and rejects Rexon's position that this pivoting base is distinct from the saw base.

###    1.    Connects the saw to the saw base

Claim seventeen discloses "[t]he saw of claim 12 wherein the saw is a compound miter saw having a tilt adjustment mechanism on the arm that *connects the saw to the saw base*." Rexon contends that this limitation is unamenable to construction because, as written, it discloses a saw that is connected to itself, which would be nonsensical. Specifically, Rexon points out that claim twelve discloses "a saw comprising . . . a saw base," thus, it argues, the "saw base" is part of the "saw." One World's proffered construction is that the arm joins or links the motor and blade to the saw base. It argues that the term "saw" refers to the motor and the blade.

As discussed earlier, claims are presumed valid and are considered indefinite only if no narrowing construction can properly be adopted. *Honeywell*, 341 F.3d at 1339. The definiteness analysis focuses on whether the claims, as interpreted in view of the written description, sufficiently notify the public of the scope of the patent. *Id.*

Following these guidelines, the Court cannot say that the limitation in claim seventeen is so ambiguous that no narrowing construction can be adopted. Though it is less than crystal clear from the text of the claim exactly what is meant by the term "saw," the answer is discernible from independent claim twelve, upon which claim seventeen depends, as well as from the specification.

Claim twelve discloses "[a] saw comprising: a motor having a spindle; a saw base; an

---

[4] Webster's defines "base" as "the bottom of something considered as its support." Merriam-Webster Collegiate 10th at 94.

25

arm connecting the motor to the saw base; [and] a blade secured to the spindle." Because each limitation of an independent claim is read into a dependent claim, we know that the arm connects the motor to the saw base. Thus, the term "saw" in claim seventeen must at least refer to the motor.

The specification supports the notion that the arm connects the base to the motor. In reference to figure one, the specification describes "[a]n arm 20 connect[ing] the motor assembly 22 that forms part of the saw head assembly . . . . [t]he saw head assembly 24 includes a circular saw blade 12 and also includes a fixed guard 28 and movable shield 30 as well as a handle 32 that includes the power switch 34." This excerpt also supports One World's contention that the term "saw," as used in claim seventeen, encompasses the blade. The motor assembly is part of the saw head assembly, which includes the blade. The most reasonable construction of claim seventeen, which the Court now adopts, is that the arm connects the saw base to the saw head assembly, which includes the motor, blade, fixed guard, movable shield, and handle. *See* U.S. Patent 6,755,107, col. 3, lines 28-37. Figure one supports this reading, as it is obvious that the arm 20 connects the saw base 14 to the saw head assembly 24. Though the drafter of the patent did not choose the most lucid language for claim seventeen, the Court is confident that upon review of the patent, one skilled in the field would construe "saw" to encompass the saw head assembly. In sum, the proper construction of claim seventeen is that the arm connects the saw base to the saw head assembly.

2.    **The '797 Patent**

     a.    **A support assembly for transporting a motor driven woodworking implement**

One World and Rexon dispute whether the language of the preamble of the '797 patent constitutes a claim limitation or rather simply states the purpose or intended use of the invention. The preamble provides for "[a] support assembly for transporting a motor driven woodworking implement, the support assembly comprising . . . ."

"A claim preamble has the import that the claim as a whole suggests for it." *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995). Generally, the preamble itself is considered a claim limitation only if, when read in the context of the claim as a whole, it recites essential structure or steps or if it is "necessary to give life, meaning, and vitality" to the claim. *Eaton Corp. v. Rockwell Intern. Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). If, therefore, the limitations in the body of the claim "rely upon and derive antecedent basis from the preamble," then the preamble acts as a necessary component of the claimed invention and constitutes a limitation. *Id.* On the other hand, a preamble that merely states the intended use or purpose of an invention does not act as a limitation unless it also provides antecedents for ensuing claims. *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998). Similarly, if the body of the claim discloses the complete invention, then the preamble language may be superfluous and does not limit the scope of the claim. *See Eaton*, 323 F.3d at 1339.

One World contends that the preamble language recites limitations of the claim and is necessary to give life, meaning, and vitality to the claim. It points out that claim one discloses a handle assembly that facilitates "manually tilting *the support assembly* to raise the base lower end off a horizontal surface upon which the base is placed, thereby facilitating manual movement

27

of *the support assembly* from one location to another." According to One World, this "support assembly" limitation finds its antecedent basis in the preamble. Likewise, it maintains that the phrase "for transporting a motor driven woodworking implement" is necessary to give life, meaning, and vitality to the claim because the remaining portion of the preamble would have no meaning without it. It argues that without this language, all that would be left is a support assembly that can be tilted, which ignores the invention's purpose–to provide a power tool housing that is easily transportable.

In contrast, Rexon asserts that the preamble adds no structural weight to the claimed invention but rather simply identifies the intended use of the product. Rexon stresses that the core components of the support assembly are identified in the body of claim one and that One World did not rely on this asserted function for the construction of any of the other elements of the claims.

The Court finds One World's reasoning persuasive concerning the "[a] support assembly" language. This part of the preamble constitutes a claim limitation, as it recites essential structure. As One World notes, limitations in the body of claim one derive antecedent basis from the preamble, and thus this phrase acts as a necessary component of the invention.

The Court, however, agrees with Rexon that the language "for transporting a motor driven woodworking implement" does not limit the claim scope and is simply a statement of intended use. Claim one is directed towards a "support assembly," not the combination of a support assembly and a motor driven woodworking implement. Nowhere in claim one does the plain language reference a motor driven woodworking implement, much less require that the implement be part of the claimed invention. *See Eaton*, 323 F.3d at 1341-42 (discussing *C.R.*

28

*Bard*, 157 F.3d at 1348-50). Moreover, the plain language of the preamble makes it clear that the support assembly structure is "for" transporting a motor driven woodworking implement. This language distinctly describes the intended purpose of the invention. Finally, the body of the claim fully sets forth the complete invention, and thus the referenced preamble language is superfluous within the context of claim one. In sum, the preamble phrase "for transporting a motor driven woodworking implement" is unnecessary to proper construction of claim one and adds no limitations to the body of the claim; the preamble phrase "[a] support assembly," however, does constitute a claim limitation.

### b. A base

Claim one discloses "a base having a plurality of generally vertically extending sidewalls and having a base upper end and a base lower end, an interior cavity being defined between the sidewalls and the base upper and lower ends, the base also having opposing laterally spaced apart first and second ends." One World defines "base" as "a three-dimensional structure" and asserts that the Court should define the term without reference to the remainder of the limitation cited above. Rexon construes the limitation as a three dimensional structure defined by sidewalls, a base upper end and a base lower end, and having an interior cavity. Rexon notes that the focus of claim construction is to determine the scope of the claim language in context, and thus the additional language is necessary. One World maintains that this language is not supported by the plain and ordinary meaning of the word, but unnecessarily repeats similar language recited later in the claim. In its reply, it notes that if the Court does choose to construe the additional language, it should adopt the following construction: a three-dimensional structure including a plurality of generally vertically extending sidewalls, a base upper end and a base lower end, and

29

an interior cavity being defined between the sidewalls and the base upper and lower end.

The Court agrees with Rexon that a proper construction of the term "base" in claim one must take into account the ensuing language to put the term its full context. The Court, however, does not accept Rexon's construction of "having" as meaning "defined by." As One World points out, Rexon has cited no dictionary definition to support this interpretation, nor was the Court able to find one. Webster's Third New International Dictionary, at page 1039, defines "have" as "to consist of (as all one's elements or constituent parts)." Though "including," as proposed by One World is also an appropriate definition for "have," Merriam-Webster's Collegiate Dictionary 533 (10th ed. 1999) (defining "have" as "to hold, include, or contain as a part or whole"), the Court finds "consisting of" to be the more fitting in the context of claim one.

Additionally, the Court concurs with One World that Rexon's failure to account for all of the language in the limitation renders its construction incomplete. Consequently, the Court adopts the following construction, which more closely aligns with One World's interpretation: A three-dimensional structure consisting of a plurality of generally vertically extending sidewalls, a base upper end and a base lower end, and an interior cavity being defined between the sidewalls and the base upper and lower end.

### c. A wheel assembly disposed on the base

One World and Rexon dispute the meaning of "disposed" within the following limitation of claim one: "a wheel assembly *disposed* on the base and including at least one wheel rotatable about a wheel axis, the wheel being disposed proximate the base lower end at one of the first and second ends of the base." One World suggests that the proper construction of the limitation is a wheel assembly placed on the base. In contrast, Rexon's proffered construction is

30

a mounting structure for at least one wheel put in place in contact with respect to the base, via connection or attachment to the base, with no intermediate structure between the wheel assembly and the base.

Rexon correctly notes that the "wheel assembly" must have at least one wheel rotatable around a wheel axis, as the limitation expressly provides for this element. Moreover, in One World's reply, it does not contest that "a wheel assembly" is "a mounting structure for at least one wheel." Similarly, Rexon's interpretation of "disposed on" accurately reflect that phrase's ordinary meaning. Webster's defines "dispose" as "to put in place," and "on" as "used as a function word to indicate position over and in contact with that which supports from beneath." Webster's Third New International Dictionary of the English Language 654, 1574 (unabr. ed. 1993).

Rexon, however, has not persuaded the Court that the additional language it proposes–with no intermediate structure between the wheel assembly and the base–is required by the ordinary meaning of the claim language. Rexon cites the specification and prosecution history as requiring this interpretation, but it again fails to heed a basic principle of claim construction, which require the Court to interpret terms in accordance with their ordinary meaning and not look ahead to the infringement analysis. Rexon is clearly trying to distinguish its own product from the '797 patent by seeking to insert language requiring no intermediate frame on which the base may be mounted. The Court's current task is simply to define the claims. Rexon's request involves determining examples and exclusions, which must be saved for the infringement analysis. Moreover, the additional language Rexon proposes is somewhat redundant, as the ordinary meaning of the term requires that the wheel assembly be placed in

31

contact with the base. In sum, the proper construction of this limitation is a mounting structure for at least one wheel put in place over and in contact with the base.

### d. A handle assembly mounted on the base

Claim one also discloses "a handle assembly *mounted on the base* at the other of the first and second ends opposing that end proximate the wheel, the handle assembly facilitating manually tilting the support assembly to raise the base lower end off a horizontal surface upon which the base is placed, thereby facilitating manual movement of the support assembly from one location to another." One World asserts that the proper interpretation of the limitation language is that a handle assembly is attached to the base. Rexon again postulates that this language means that the handle is attached directly to the base with no intermediate structure between the handle and the base.

At the outset, the Court notes that it is not entirely clear whether the parties dispute the meaning of "handle assembly." In its reply, One World contends that it mistakenly omitted the word "assembly" from its proposed construction in its opening brief. It points out that its original opening brief shows this was the intended interpretation but maintains that this does not affect the dispute over this claim limitation. Rexon does not provide a reason for narrowing "handle assembly" to just a handle but rather notes that the parties do not dispute that the term is directed towards a handle – apparently referencing One World's omission of the word "assembly" in its opening brief. Because the plain language of the limitation explicitly discusses a "handle assembly," the Court, at this time, will interpret the claim to require a handle assembly.

Both parties agree that the ordinary meaning of "mount" is to attach to a support. Moreover, the parties agree that the specification supports this interpretation. The parties

32

disagree, however, over the necessity of including Rexon's additional proposed language "with no intermediate structure between the handle and the base." For the reasons set forth in the discussion of the limitation involving the wheel assembly disposed on the base, the Court declines to include this language in its construction.

Inexplicably, Rexon's construction does not take into account the ordinary meaning of the word "on," as used in the claim phrase "mounted on." Perhaps Rexons considers "directly attached" to be the ordinary meaning of "on," but if so, it has cited no dictionary definitions that support this reading. The Court adopts the ordinary meaning of "on," as determined with respect to the limitation "disposed on." Thus, the proper construction of this limitation is a handle assembly attached to the base, such that the handle assembly is in contact with the base.

### e. To a position within the base

Claim thirteen discloses two pairs of foldable legs, the "first pair of legs being upwardly swingable to a position within the base, and the second pair of foldable legs also being upwardly swingable to a position within the base, thereby alternatively facilitating the use of the assembly on a raised table top." The parties' dispute surrounds the meaning of the term "within." One World construes the limitation as requiring that the first and second pairs of foldable legs are retractable sufficiently into the base so that the assembly can be used on a raised table top. Rexon asserts that the proper construction necessitates that the legs swing to a folded position in the interior cavity of the base. Rexon argues that One World has improperly qualified the claim limitation by inserting the language "sufficiently into the base." The Court agrees. There is no evidence that the patentee intended a meaning different from the ordinary meaning of within. The phrase "facilitating the use of the assembly on a raised table" does not redefine the word

33

"within" but instead provides an explanation for why this feature was included as part of the invention.

Rexon and One World provide similar definitions of "within." One World cites American Heritage's definition, which defines "within" to mean "in or into the inner part." The American Heritage Dictionary 1976 (4th ed. 2000). Rexon relies on Webster's definition: "on the inside or on the inner side." Webster's Third New International Dictionary of the English Language 2627 (unabr. ed. 1993). Both of these definitions are applicable to "within" when used as an adverb. The Court also notes that when used as a preposition, as is the case in the limitation at issue, the word "within" may be "used as a function word to indicate enclosure or containment." *Id.* Each of these definitions illustrates that "within," in the context of the claim, means that the legs fold into a position in the interior cavity of the base, as Rexon asserts. Moreover, this interpretation is supported by figures 10A-10C in the specification, which illustrate the process of folding the legs within the base. In figure 10C, in which the legs are fully retracted, the legs do not extend below the base lower end, aside from the pads attached to the second pair of legs to provide balanced footing for the support assembly. *See* U.S. Patent No. 6,360,797, col. 5, lines 12-15.

In sum, the proper construction comports more closely with Rexon's interpretation. The Court therefore adopts the following construction: both pairs of legs are upwardly swingable to a folded position in the interior cavity of the base.

###### f.    A Web

The parties appear to be in agreement regarding the appropriate construction of "a web" and "a similar web," as used in claim fourteen. Both One World and Rexon maintain that the

34

ordinary meaning of web as used in the claim is a sheet, plate or strip of material. Merriam-Webster's Collegiate Dictionary 1339 (10th ed. 1999). Thus, the parties are in accord based on the plain and ordinary meaning of the term.

### Conclusion

The disputed claim terms are construed in accordance with the conclusions set forth in this Memorandum Opinion and Order.

MATTHEW F. KENNELLY
United States District Judge

Date: June 3, 2005